In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1999–00 # 256,

Jerry G. Percy, Petitioner,

v.

John Fielder and Elise Jones, Respondents,

and

William Hobbs, Alan J. Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause, and Summary for 1999–00 # 256,

Ray Christensen, Brad Anderson and Kent Lebsack, Petitioners,

v.

John Fielder and Elise Jones, Respondents,

and

William Hobbs, Alan J. Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause, and Summary for 1999–00 # 256,

Robert A. Lembke, Petitioner,

v.

John Fielder and Elise Jones, Respondents,

and

William Hobbs, Alan J. Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause, and Summary for 1999–00 # 256,

Rodman Stewart, Petitioner,

v.

John Fielder and Elise Jones, Respondents,

and

William Hobbs, Alan J. Gilbert and Charles W. Pike, Title Board.

Nos. 00SA175, 00SA177, 00SA178, 00SA179.

Supreme Court of Colorado, En Banc.

Oct. 23, 2000.

Isaacson, Rosenbaum, Woods & Levy, P.C., Mark G. Grueskin, Blain D. Myhre, Denver, CO, Attorneys for Petitioner in No. 00SA175.

Bill Myers, P.C., Bill Myers, Kelly, Haglund, Garnsey & Kahn, LLC, Edwin S. Kahn, Denver, CO, Claire B. Levy, LLC, Claire B. Levy, Boulder, CO, Attorneys for Respondents in Nos. 00SA175, 00SA177, 00SA178, 00SA179.

Ken Salazar, Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, CO, Attorneys for Title Board in Nos. 00SA175, 00SA177, 00SA178, 00SA179.

Fairfield and Woods, P.C., Stephen H. Leonhardt, John L. Palmquist, Bernard F. Gehris, Denver, CO, Attorneys for Petitioners in No. 00SA177.

Kerr, Friedrich, Brosseau, Bartlett, LLC, John O'Brien, Denver, CO, Co-counsel for Petitioner Brad Anderson in No. 00SA177.

Grimshaw & Harring, A Professional Corporation, Richard L. Harring, Norman F. Kron, Joan M. Fritsche, Denver, CO, Attorneys for Petitioner in No. 00SA178.

Ireland, Stapleton, Pryor & Pascoe, P.C., Christopher G. Hayes, Denver, CO, Attorneys for Petitioners in No. 00SA179.

PER CURIAM.

We consolidated these four ballot title review proceedings concerning a proposed initiative titled "Citizen Management of Growth."

The petitioners are registered electors who brought these proceedings pursuant to section 1–40–107(2), 1 C.R.S. (1999), to review the actions taken by the initiative title setting

board (the Board) in fixing the title, ballot title and submission clause (titles), and summary (collectively, titles and summary)[1] for Initiative 1999–00 # 256 (the Initiative).[2]

On April 21, 2000, the proponents, John Fielder and Elise Jones, filed a draft of the Initiative with the Secretary of State's Office. If adopted, the Initiative would add a new article XXVIII to the Colorado Constitution, entitled "Citizen Management of Growth." The measure generally provides that, unless otherwise excepted, local governments may approve development only: (1) within areas committed to development, as defined in the proposal; or (2) within future growth areas defined by voter-approved growth area maps. Local government has the responsibility to: (1) delineate the areas committed to development; and (2) prepare and submit to the voters on specified election dates a growth area map, the content of which is defined in the proposal.

The Initiative was set on the Board's agenda for hearing on May 3, 2000. On that date, the Board set the Initiative's titles and summary. On May 10, all of the petitioners filed motions for rehearing. The Board heard the motions on May 17, 2000, and granted them in part and denied them in part.

These four review proceedings raise both procedural and substantive issues. The issues can be grouped in three main categories: a procedural issue relating to the Board's jurisdiction to set the titles and summary; whether the Initiative contains a single subject; and whether the titles and summary reflect the true intent of the Initiative or whether they are misleading. We conclude that the Board had jurisdiction to set the titles; the Initiative contains only a single subject; and that the titles and summary are not misleading. On July 3, 2000, we announced that the action of the Board was affirmed, with an opinion to follow. This is that opinion.

## I. THE JURISDICTIONAL ISSUE

The petitioner in No. 00SA175, Jerry G. Percy, claims that the Board did not have jurisdiction to set the titles and summary because of four amendments the proponents made to the Initiative before submitting it to the secretary of state. Article V, section 1(5) of the Colorado Constitution states:

(5) The original draft of the text of proposed initiated constitutional amendments and initiated laws shall be submitted to the legislative research and drafting offices of the general assembly for review and comment. No later than two weeks after submission of the original draft, unless withdrawn by the proponents, the legislative research and drafting offices of the general assembly shall render their comments to the proponents of the proposed measure at a meeting open to the public, which shall be held only after full and timely notice to the public. Such meeting shall be held prior to the fixing of a ballot title. Neither the general assembly nor its committees or agencies shall have any power to require the amendment, modification, or other alteration of the text of any such proposed measure or to establish deadlines for the submission of the original draft of the text of any proposed measure.

■ Section 1–40–105, 1 C.R.S. (1999), specifies the procedures that the proponents and the directors must follow:

(1) The original typewritten draft of every initiative petition for a proposed law or amendment to the state constitution to be enacted by the people, before it is signed by any elector, shall be submitted by the proponents of the petition to the directors of the legislative council and the office of legislative legal services for review and comment.... No later than two weeks after the date of submission of the original draft ... the proponents, the directors of the legislative council and the office of legislative legal services, or their designees, shall render their comments to the proponents of the petition concerning the format or contents of the petition at a meeting open to the public. Where appropriate, such comments shall also contain suggested editorial changes to promote

---

1. The Board's titles and summary for the Initiative are attached as Appendix A to this opinion.

2. The text of proposed initiative 1999–00 # 256 is attached as Appendix B.

compliance with the plain language provisions of this section....

(2) After the public meeting but before submission to the secretary of state for title setting, the proponents may amend the petition in response to some or all of the comments of the directors of the legislative council and the office of legislative legal services, or their designees. *If any substantial amendment is made to the petition, other than an amendment in direct response to the comments of the directors of the legislative council and the office of legislative legal services, the amended petition shall be resubmitted to the directors for comment in accordance with subsection (1) of this section prior to submittal to the secretary of state as provided in subsection (4) of this section.*

(Emphasis added.) The requirement that the original draft be submitted to the legislative council and office of legislative legal services permits the proponents to benefit from the experience of experts in constitutional and legislative drafting, and allows the public to understand the implications of a proposed initiative at an early stage in the process. *See In re Proposed Initiated Constitutional Amend. Concerning Limited Gaming in the Town of Idaho Springs*, 830 P.2d 963, 966 (Colo.1992).

According to Percy, following the public meeting before the directors of the legislative council and the office of legislative legal services (the directors), *see* Colo. Const. art. V, § 1(5); § 1–40–105(1), the proponents made four substantial changes to the Initiative that were not in direct response to comments made by the directors, *see* § 1–40–105(2). After making the changes, the proponents did not resubmit the Initiative to the directors for comment before submitting the Initiative to the secretary of state. *See* § 1–40–105(2). Percy asserts that because the proponents did not resubmit the Initiative to the directors, the Board did not have jurisdiction to set the titles and summary. *See In re Limited Gaming*, 830 P.2d at 966–68; *In re Proposed Initiative Under the Designation "Tax Reform"*, 797 P.2d 1283, 1288 (Colo.1990).

The proponents and the Board respond that the changes to the Initiative were made either in direct response to the directors' comments, or were not substantial, and thus section 1–40–105(2) did not require the amended petition to be resubmitted to the directors.

■ Percy contends that the addition of the following amendments to the original version of the Initiative required resubmission of the amended version to the directors:

(1) Section 4(5)(c) of the original version contained three criteria that growth area maps:

(c) Shall be consistent with growth proposed by other Local Governments, in that Growth Area Maps (1) shall be developed in cooperation with the government of each county in which the proposed Growth Area is located and any other Local Government that shares a common boundary with the proposed Growth Area; (2) shall not conflict with or overlap the Growth Area Map that another Local Government is proposing for approval at the same election or which has been previously approved by the voters of another Local Government; *and (3) shall be consistent with any area for future growth (i) approved by any Regional Planning Commission, Metropolitan Planning Organization, or council of governments with the participation of the proposing Local Government or (ii) created by intergovernmental agreement to which the proposing Local Government is a party.*

(Emphasis added.) The corresponding paragraph in the final version submitted to the secretary of state (section 4(4)(c)) omits the third requirement, which is emphasized above. Percy claims that this was a substantial change that was not in direct response to the directors' comments. However, the directors' substantive question 3 had a number of parts. It first asked the proponents to what extent the Initiative was intended to supersede the home rule powers of local governments. Specifically, it asked to what extent the proposed amendment curtailed home-rule powers with respect to "site specific development applications," "[e]xisting self-imposed urban growth boundaries," and

"[e]xisting intergovernmental agreements." The proponents responded by deleting section 4(5)(c)(3), removing the reference to urban growth boundaries and intergovernmental agreements. Because we are satisfied that this change was in direct response to the directors' substantive question 3, it did not need to be resubmitted to the directors. *See In re Proposed Initiative 1997–98 # 10,* 943 P.2d 897, 901 (Colo.1997).

■ (2) The second change involved the insertion of "local government" before "revenue sharing arrangements" in the last line of section 5(2)(a) in the final version. This section provides that the local government proposing a growth area prepare and distribute to the voters a growth impact disclosure to accompany a growth area map, which shall describe, among other things, "any local government revenue sharing arrangements." Percy contends that the addition of "local government" before "revenue sharing arrangements" is a substantial amendment to the original version of the Initiative.

However, section 5(2) pertains to local governments, so the addition of "local government" before "revenue sharing arrangements" is only a clarification, not a substantive change. *See In re Limited Gaming,* 830 P.2d at 968 n. 7.

■ (3) The third change was made to section 6, which now provides:

Section 6. Allowed Actions within Growth Area. ALL DEVELOPMENT, SUBDIVISION OF LAND, CHANGES IN LAND USE OR DENSITY, AND CONSTRUCTION OR EXTENSION OF CENTRAL WATER OR SEWER SYSTEMS OR ROADS ON LAND THAT IS WITHIN A VOTER–APPROVED GROWTH AREA SHALL BE IN ACCORDANCE WITH THE GROWTH AREA MAP. *DEVELOPMENT UNDERTAKEN BY OTHER POLITICAL SUBDIVISIONS OF THE STATE, ENTERPRISES, SPECIAL IMPROVEMENT DISTRICTS, SPECIAL DISTRICTS, TAX INCREMENT FINANCING DISTRICTS, OR SCHOOL DISTRICTS, SHALL ALSO BE IN ACCORDANCE WITH THE GROWTH AREA MAP.*

(Emphasis added.) The draft that was submitted to the directors provided: "Development undertaken by other political subdivisions of the state, *including enterprise districts or funds,* special improvement districts, special districts, tax increment financing districts, and school districts, shall also be in accordance with the Growth Area Map." (Emphasis added.) Thus, the final version omits "including enterprise districts or funds," and replaces that with "enterprises."

The directors' substantive question 23(c) asked:

(c) Section 6 uses certain political subdivisions such as enterprise districts or funds, special improvement districts, special districts, tax increment financing districts, and school districts. Only special districts and school districts are political subdivisions of the state under current law. Do the proponents intend for the proposed amendment to make "enterprise districts or funds," special improvement districts, and "tax increment financing districts" political subdivisions having their own governing bodies? If so, do the proponents intend for the General Assembly to enact laws to accomplish this purpose?

Questions 23(d) and (e) asked what an "enterprise district" and what an "enterprise fund" were. The questions highlighted ambiguities in the original draft of section 6. In response, the proponents tried to eliminate the language creating the ambiguities that the directors pointed out. Because the changes to section 6 in the final version were in direct response to the comments of the directors, the proponents were not required to resubmit the initiative to the directors.

■ (4) The last change that Percy asserts required resubmission to the directors is in section 10. The version submitted to the directors stated: "Section 10. Private Property Rights. Nothing in this section is intended to affect the constitutional protections afforded to private property." The final version reads: "Section 10. Private Property Rights. NOTHING IN THIS SECTION IS INTENDED TO AFFECT OTHER CONSTITUTIONAL PROTECTIONS AFFORDED TO PRIVATE PROP-

ERTY." The final version substituted *"other* constitutional protections" for *"the* constitutional protections."

While this change was not in direct response to the directors' questions, we conclude that in the context of the amendment as a whole, it was a clarification and not a substantive change. Therefore, the change did not require resubmission to the directors.

## II. SINGLE SUBJECT–REQUIREMENT

■ All of the petitioners allege that the Board should not have set the titles and summary for the Initiative because it contains more than one subject. Multiple subjects are prohibited by article V, section 1(5.5) of the Colorado Constitution, which states:

No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

Colo. Const. art. V, § 1(5.5). *See also* § 1–40–106.5, 1 C.R.S. (1999)(addressing the constitutional single-subject requirement). In *In re Proposed Initiative for 1999–2000 # 25,* 974 P.2d 458, 460–62 (Colo.1999), we explained the origins and history of the single-subject requirement. A proposed initiative violates this requirement when it "relate[s] to more than one subject and ... [has] at least two distinct and separate purposes which are not dependent upon or connected with each other." *In re Proposed Initiative "Public Rights In Waters II,"* 898 P.2d 1076, 1078–79 (Colo.1995). However, a proposed measure that "tends to effect or to carry out one general objective or purpose presents only one subject." *In re 1999–2000 # 25,* 974 P.2d at 463. Consequently, "[m]inor provisions necessary to effectuate the purpose of the measure are properly included within its text." *In re Petitions,* 907 P.2d 586, 590 (Colo.1995). So long as the proposal encom-

passes a single subject, even if the subject is general, it does not violate the constitution. By these benchmarks, the proposed measure in this case does not contain more than one subject. We address all of the petitioners' objections below.

■ In No. 00SA175, Percy asserts that the Initiative identifies a number of purposes that are independent of each other: preserving scenic vistas and historical and archaeological sites, alleviating unfair tax burdens on existing residents, and protecting neighborhoods. *See* Initiative § 1. Moreover, even if the Board properly characterized the proposal as "concerning the management of development," Percy alleges that it contains various provisions that are not dependent on or connected with that subject: the exclusions from the definition of "development," specifically the disparate impact of the Initiative on facilities for the diversion, storage, transportation, or use of water within and without Colorado; the definition of "regular election" to allow only one day a year for approval of new growth areas; the detailed requirements for development that impinge on home rule autonomy; and the ten-year time limitation on borrowing, taxing, and spending to construct and to service a new growth area with central water and sewer systems and with roads.

In No. 00SA177, petitioners Ray Christensen, Brad Anderson, and Kent Lebsack (Christensen or Christensen petitioners) object that the measure contains at least three distinct subjects: it concerns voter approval of growth areas based on criteria designed for urban and residential growth; it limits voter choice by requiring central water and sewer service in areas that may be approved; and it restricts certain agricultural uses of the land, particularly confined animal feeding operations.

In No. 00SA178, petitioner Robert A. Lembke asserts that one distinct and separate purpose of the measure is to alter the power and authority of home rule cities to make land use decisions. The Initiative requires that growth maps be coordinated among the jurisdictions affected, giving persons outside of a home rule city a veto power over land use in home rule cities. According

to Lembke, the control of growth outside of home rule cities and within such cities are two different subjects, the former arguably an issue of state-wide concern and the latter a purely local concern. Also, restricting "regular elections" to one day a year when the voters may approve a growth map is another shift of power away from home rule cities.

Another subject according to Lembke is the impairment of vested property rights, notwithstanding section 10 of the measure that states, "NOTHING IN THIS SECTION [sic] IS INTENDED TO AFFECT OTHER CONSTITUTIONAL PROTECTIONS AFFORDED TO PRIVATE PROPERTY."

Lembke contends that a third subject is land use regulation; in particular, the measure takes away planning and zoning decisions from local government. Lembke also claims that an additional subject involves taking away the right of a landowner to petition the government for redress of grievances.

Finally, Rodman Stewart in No. 00SA179[3] alleges that the Initiative contains the following multiple subjects: it curtails the plenary authority of home rule governments to control land use; it creates a mandatory referendum requirement for voters to approve growth maps, thus giving the voters the power to make land use decisions previously made by local government officials, and also cutting off the appeal rights of citizens adversely affected by the voters' decisions; and the measure transfers land use authority to other local government entities by virtue of the requirement that growth area maps be made in cooperation with those entities.

In sum, the petitioners claim that the proposed measure contains the following distinct subjects: (1) the exclusions from the definition of "development" that have disparate impacts on facilities for the diversion, storage, transportation, or use of water within and without Colorado; (2) alteration of the power and authority of home rule cities to make land use decisions; (3) the transfer of land use authority to outside local government entities by requiring that growth area maps be made in cooperation with those entities; (4) its referendum requirement, which is restricted to one day a year, requires voters to approve growth maps, thus giving the voters the power of making land use decisions previously made by local government officials and cutting off the appeal rights of citizens adversely affected by the voters' decisions; (5) the Initiative would impair vested property rights; (6) it takes away the right of a landowner to petition the government for redress of grievances; (7) the proposal contains a ten-year time limitation on borrowing, taxing, and spending to construct and to service a new growth area with central water and sewer systems and with roads; (8) it limits voters' choice by requiring central water and sewer service in areas that may be approved; and (9) it restricts certain agricultural uses of the land, specifically, confined animal feeding operations.

▪ We conclude that the Initiative encompasses a single subject, albeit a broad one. We have never held that just because a proposal may have different effects or that it makes policy choices that are not inevitably interconnected that it necessarily violates the single-subject requirement. It is enough that the provisions of a proposal are connected. *See In re Proposed Initiative for 1999–2000 # 25*, 974 P.2d at 463.

The Initiative here addresses numerous issues in a detailed manner. However, all of these issues, including the ones listed above, relate to the management of development. *See In re Petitions*, 907 P.2d at 590–91. The referendum requirement reflects a choice that the voters have a more direct say in managing future development; the curtailment of home rule powers over development is a necessary result of that choice. The exceptions from the definition of "development" reflect policy choices by the proponents, but these choices are related to the purpose of the Initiative, as is the exemption

---

**3.** On June 20, 2000, the proponents filed a suggestion of death, asserting that Rodman Stewart had died while this case was pending, before we affirmed the Board's action on July 3, 2000. None of the parties has suggested that anyone be substituted for Stewart or that No. 00SA179 be dismissed. The issues he raised before the Board were fully briefed before his death and we have elected to address those issues here. The issues were not rendered moot in the strict sense by his death, and our disposition of these cases requires no further action on the part of any party.

for confined animal feeding operations. The election requirements are connected directly to the referendum requirement, as are the detailed requirements for future growth area maps submitted to the voters. Water and sewer service is an issue directly related to new development. Accordingly, the proposed Initiative does not violate the prohibition against multiple subjects, so the Board did not err when it set the titles and summary.

### III. TITLES AND SUMMARY

▆▆▆ The petitioners allege that the titles and summary are misleading and that they do not correctly and fairly express the Initiative's true intent and meaning. Section 1–40–106(3)(b), 1 C.R.S. (1999) provides:

(b) In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *The title for the proposed law or constitutional amendment, which shall correctly and fairly express the true intent and meaning thereof,* together with the ballot title, submission clause, and summary, shall be completed within two weeks after the first meeting of the title board.... *Ballot titles shall be brief,* shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

(Emphasis added.) Our standards for reviewing the Board's titles and summary are well-settled. As we said in *In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127, 1131 (Colo.1996), "In reviewing the actions of the Board, we grant 'great deference to the board's broad discretion in

the exercise of its drafting authority.' " (quoting *In re Proposed Initiative Concerning "State Personnel Sys.,"* 691 P.2d 1121, 1125 (Colo.1984)). We will not rewrite the titles and summary to achieve the best possible statement of the proposed measure's intent. *See In re Mineral Prod. Tax Initiative,* 644 P.2d 20, 25 (Colo.1982). We will reverse the Board's action in setting the titles only when the language chosen is clearly misleading. *See In re "State Personnel Sys.,"* 691 P.2d at 1125. "We construe constitutional and statutory provisions governing the initiative process in a manner that facilitates the right of initiative instead of hampering it with technical statutory provisions or constructions." *Armstrong v. Davidson,* 10 P.3d 1278, 1282 (Colo.,2000) (citation omitted). Moreover, the summary is "not intended to fully educate people on all aspects of the proposed law, and it need not set out in detail every aspect of the initiative." *In re Proposed Initiative Under the Designation Tax Reform,* 797 P.2d 1283, 1289 (Colo.1990).

▆▆▆ Percy claims that the titles unduly simplify what is a complex proposal. For example, the titles do not define "regular election," and they do not note that all local governments, as well as private property owners, must comply with growth area maps. Percy also argues that the titles are misleading and inaccurate because they state that local governments "shall approve development only within areas committed to development."[4] According to him, this is a circular statement that "fails to inform the voters of the requirements established for 'committed areas.' " Thus, the way that Percy reads the proposal, one of the principal requirements for a committed area is service by central water and sewer systems; another is the existence of structures on at least 50% of the site. He argues that inclusion of these requirements in the titles would have aided voter understanding and that the failure to include such information renders the titles defective.

Section 2(2) of the Initiative defines "committed area" as

4. The titles provide: "[L]ocal governments, *unless otherwise excepted,* shall approve development only within areas committed to devel-

opment *or* within future growth areas in accordance with voter-approved growth area maps...." (Emphasis added.)

[a]n area of land which has been committed to development, in that the land meets one or more of the following criteria:

(a) as of the date on which the local government becomes subject to this article, all of the land contained within a recorded subdivision or townsite and at least 50% of the lots in such subdivision or townsite (i) have had permanent, primary structures constructed on them or (ii) have had central water and sewer services extended to them and all lots are or shall be served by central water and sewer when the development is complete; or

(b) a valid development application as to such land, the approval of which would result in development that shall be served by central water and sewer services, has been submitted to the appropriate local government, as of the date on which the 2000 general election ballot was certified by the Colorado Secretary of State; or

(c) the land has been identified by the local government as an area for development or redevelopment and it directly abuts, except for intervening dedicated public streets or roads, areas meeting the criteria of paragraph (a) of subsection (2) hereof along 100% of its perimeter, or along at least 50% of its perimeter and by permanently protected open spaces, federal lands, or bodies of water along the remainder of its perimeter.

■ The Board's job is to set fair, clear, and accurate titles that do not mislead the voters through a material omission or misrepresentation. See In re 1997–1998 # 75, 960 P.2d 672, 673 (Colo.1998). However, the titles need not spell out every detail of a proposal. In this case, the definition of "committed area" is lengthy and complicated. The summary provides that "[t]he measure defines 'committed area' to mean an area of land that had been committed to development in that the land meets one of three criteria as specified in the measure." Should the Initiative pass, the interplay between the existence of permanent, primary structures on the land and the requirement for water and sewer service may possibly be the subject of future judicial interpretation. The omission of the definition of "committed

area" from the titles does not render them misleading or inaccurate. It was therefore within the Board's discretion to omit the complex definition of "committed area" from the titles. For the same reason, we conclude that the titles are not defective for including the phrases "regular election," "areas committed to development," and "future growth areas" without also informing voters of their specific legal definitions.

■ Percy, along with Christensen (one of the petitioners in No. 00SA177), claim that the titles do not clearly express the subject of the Initiative, as article V, § 1(5.5) requires. According to Percy, although titles state that the subject of the Initiative is the "management of development," the Initiative contains detailed requirements in three circumstances where development may be approved. In addition, Percy claims that because neither the voters nor local government are given actual control over development, the prime subject is actually the "regulation of development approval."

The Christensen petitioners claim that the Board used the phrase "concerning management of development" because of its concern that the Initiative might appear to contain more than one subject. According to these petitioners, the titles mislead and confuse the public by ignoring the distinctions among the Initiative's multiple subjects of providing voter control over development, requiring central water and sewer services, and restricting certain agricultural uses outside of committed and growth areas. Thus, while voters may be attracted to the concept of citizen control of development, they will be surprised that the measure provides no alternatives in committed and growth areas to central water and sewer service, and that it prohibits voters and local governments from approving certain agricultural uses outside of such areas.

However, it is not our function to write the best possible titles. See In re Mineral Prod. Tax Initiative, 644 P.2d at 25. Only if the Board's chosen language is clearly inaccurate or misleading will we reverse it. See In re "State Personnel Sys.," 691 P.2d at 1125. In this case, the phrase "concerning the management of development" aptly characterizes

a complex proposal, and we decline to overturn it.

 Christensen asserts, as did Percy, that the titles are defective for not defining "committed area." We have already rejected this contention above. Christensen also alleges that the titles should have disclosed the Initiative's application to livestock production outside of exempt counties. In particular, he points out that the titles do not spell out the Initiative's effect on agricultural activities (specifically, confined animal feeding operations). However, confined animal feeding operations are merely included in the Initiative's sweep, as are many, many other businesses. The titles are not required to list all of the businesses to which the Initiative applies. Confined animal feeding operations are only mentioned in the Initiative to make it clear that they do not fall within any of the *exceptions* to the definition of development. Thus, these operations are not being singled out, except for clarity. Similarly, the failure to define "confined animal feeding operations" in the summary does not render the titles and summary defective and misleading.

 In No. 00SA178, Lembke claims that the subject contained in the titles, "concerning the management of development," hides the proponents' true intent, which, according to him, "is to limit, delay or prohibit most residential, commercial and industrial construction and to strip local government professional planners and elected officials of their authority to plan and regulate zoning and land use within the borders of their communities." Thus, the word "management" fails to convey that voter approval of growth maps is only a once-a-year event because "[e]llections are not management and management cannot be performed by annual elections." Stewart, in No. 00SA179, presents the same argument. We have held that "concerning the management of development" is an appropriate description of the subject of the proposal. Moreover, as we have said, our function is not to speculate on the future effects the Initiative may have if it is adopted. Whether the Initiative will indeed have the effects the petitioners claim is

beyond the scope of our review. *See In re Ballot Title # 255*, 4 P.3D 485, 495 (Colo. 2000).

 Finally, Lembke alleges that the phrase "management of development" is an impermissible catch phrase "which could easily form the basis of a campaign slogan regarding the current public debate on growth." "'Catch phrases' are words that work to a proposal's favor without contributing to voter understanding. By drawing attention to themselves and triggering a favorable response, catch phrases generate support for a proposal that hinges not on the content of the proposal itself, but merely on the wording of the catch phrase." *In re Ballot Title 1999–2000 No. 258(A)*, 4 P.3D 1094, 1100 (Colo.2000). However, we view "concerning the management of growth" as a neutral phrase, with none of the hallmarks that have characterized catch phrases in the past. *See, e.g., id.* (holding that the words "as rapidly and effectively as possible" in relation to teaching children English was an improper catch phrase). Nor has Lembke adduced any evidence that this phrase is anything other than merely descriptive of the proposal. *See id.*

We therefore conclude that the titles and summary that the Board has set are not defective.

### IV.

Accordingly, we affirm the action of the board in setting the titles and summary.

### Appendix A

### *Ballot Title Setting Board*

### *Proposed Initiative 1999–2000 # 256* [1]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING THE MANAGEMENT OF DEVELOPMENT, AND, IN CONNECTION THEREWITH, SPECIFYING THAT LOCAL GOVERNMENTS, UNLESS OTHERWISE EXCEPTED, SHALL AP-

---

1. Citizen Management of Growth.

PROVE DEVELOPMENT ONLY WITHIN AREAS COMMITTED TO DEVELOPMENT OR WITHIN FUTURE GROWTH AREAS IN ACCORDANCE WITH VOTER APPROVED GROWTH AREA MAPS, REQUIRING SUCH LOCAL GOVERNMENTS TO DELINEATE AREAS COMMITTED TO DEVELOPMENT, REQUIRING LOCAL GOVERNMENTS PROPOSING A FUTURE GROWTH AREA TO SUBMIT A GROWTH AREA MAP TO A VOTE AT A REGULAR ELECTION, SPECIFYING THE CONTENT OF GROWTH IMPACT DISCLOSURES TO BE DISTRIBUTED TO VOTERS IN CONNECTION WITH SUCH ELECTIONS, AND SPECIFYING THE TYPE OF ALLOWED ACTION OR DEVELOPMENT WITHIN GROWTH AREAS, COMMITTED AREAS, OR OUTSIDE SUCH AREAS.

The ballot title and submission clause as designated by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING THE MANAGEMENT OF DEVELOPMENT, AND, IN CONNECTION THEREWITH, SPECIFYING THAT LOCAL GOVERNMENTS, UNLESS OTHERWISE EXCEPTED, SHALL APPROVE DEVELOPMENT ONLY WITHIN AREAS COMMITTED TO DEVELOPMENT OR WITHIN FUTURE GROWTH AREAS IN ACCORDANCE WITH VOTER APPROVED GROWTH AREA MAPS, REQUIRING SUCH LOCAL GOVERNMENTS TO DELINEATE AREAS COMMITTED TO DEVELOPMENT, REQUIRING LOCAL GOVERNMENTS PROPOSING A FUTURE GROWTH AREA TO SUBMIT A GROWTH AREA MAP TO A VOTE AT A REGULAR ELECTION, SPECIFYING THE CONTENT OF GROWTH IMPACT DISCLOSURES TO BE DISTRIBUTED TO VOTERS IN CONNECTION WITH SUCH ELECTIONS, AND SPECIFYING THE TYPE OF ALLOWED ACTION OR DEVELOPMENT WITHIN GROWTH AREAS, COMMITTED AREAS, OR OUTSIDE SUCH AREAS?

The summary prepared by the Board is as follows:

The measure adds a new article XXVIII to the Colorado Constitution. The measure states that the people find that rapid, unplanned, and unregulated growth through development and subdivision is a matter of statewide significance and concern. The measure states that its purpose is to require citizen management of growth by providing voters with information concerning growth impacts, by providing voters with control over growth areas in their communities, and by requiring coordination among local governments with respect to proposed growth areas. The measure states that it shall preempt any inconsistent provision of the Colorado Constitution, state statute, local ordinance, or other provision of law.

The measure specifies that local governments, unless otherwise excepted in accordance with its provisions, shall approve development only within areas committed to development or within growth areas in accordance with voter-approved growth area maps.

The measure defines "committed area" to mean an area of land that has been committed to development in that the land meets one of three criteria as specified in the measure.

The measure defines "development" to mean commercial, residential, or industrial construction or other activity that changes the basic character of the land so as to permit commercial, residential, or industrial construction. The term "development" shall not include the construction, operation, maintenance, repair or replacement of facilities for telecommunications, public utilities, mining of minerals and construction materials, oil and gas exploration and production, or for the diversion, storage, transportation, or use of water within the State of Colorado.

The measure defines "growth area" to mean an area shown on a growth map approved by the voters as an area within which development may occur.

The measure defines "local government" to mean all statutory, charter and home rule cities and towns, home rule and statutory counties, and cities and counties.

The measure specifies that its terms shall apply to all counties and city and counties with a population in excess of 10,000 residents according to the most recent decennial census or, if more than five years have passed since such census, the population as projected by the department of local affairs as of the beginning of the fifth year following the date of the census. The governing body of any county whose population is less than 25,000 residents may submit a referred question to the voters exempting for a period of four years the entire county and all local governments within it from the requirements of the measure. This four-year period may be renewed or extended by a subsequent referred question.

The measure specifies that its terms shall apply to every city or town with any portion of its corporate limits located in any county to which the proposed amendment applies. Cities or towns whose population is less than 1,000 residents shall not be required to prepare a growth map; except that such cities or towns shall not approve any development that would cause the city's or town's population to exceed 1,000 until the voters of that jurisdiction have approved a map for such jurisdiction in conformity with the requirements of the measure.

The measure requires every local government subject to its terms to delineate its committed area no later than December 31, 2001, or within one year of becoming subject to the requirements of its terms, whichever occurs later.

The measure specifies that a growth area map shall include a map and text describing a proposed growth area and shall identify the general locations of each proposed land use and the general range of development densities within such growth area. No proposed growth area may be designated on a growth area map unless the development in such area shall be served by a central water and sewer system and roads satisfying the criteria specified in the measure within ten years following voter approval. For every city, city and county, or town, each proposed growth area shall abut along one-sixth or more of its perimeter to a committed area or to one or more growth areas that were previously approved by the voters of that jurisdiction.

The measure requires each growth area map and its text to be consistent with growth impact disclosures set forth in the measure, developed with citizen participation, and consistent with growth proposed by other local governments.

The measure requires each local government proposing a growth area to refer each proposed growth area map to a popular vote at a regular election. The measure specifies requirements for the ballot title and submission clause for such referendum. Under the measure, the proposing local government shall also provide growth impact disclosures that describe the impacts of development allowed by the proposed growth area map. The measure specifies how such disclosures are to be distributed to voters. Such disclosures are to describe the elements of the proposed growth area and the anticipated effects of the proposed growth area.

The measure specifies that all growth impact disclosures shall be based upon the best generally available data routinely used by local government planners in Colorado in the preparation of master or comprehensive plans.

The measure requires development or subdivision of land within a voter-approved growth area to be undertaken in accordance with the growth area map. Development or subdivision of land within a committed area may be completed without voter approval if the development is completed in accordance with approved plans and any applicable regulations and guidelines. No development or subdivision of land shall be approved for land not included in a committed area or growth area; except that a local government may approve or allow development or subdivision activity with respect to such areas pursuant to eight different exceptions as specified in the measure where such activity satisfies

such jurisdiction's land use rules and regulations. Those exceptions are as follows:

• Development that does not require any further local government approvals or requires only the issuance of a building permit;

• Development or subdivision of land consistent with a valid development application in conformity with the provisions of the measure;

• The creation of no more than three lots of no more than two acres each to accommodate residences of immediate family members of an agricultural property owner;

• A division of land that is not subject to control as a subdivision of land based upon statutes in effect at the time such land is subdivided;

• Publicly owned facilities necessary for the public health, safety, or welfare;

• A division of land that is permitted by statute as a rural cluster development as of the effective date of the measure;

• Non-residential development of less than ten thousand square feet to permit retail or service use where no other retail or service uses are located within one mile of the site; and

• Commercial or industrial development, other than confined animal feeding operations or related facilities, that provides only goods or services to support nearby agricultural operations in an area where there are no other commercial or industrial sites within one mile.

The measure specifies that it is not intended to affect other constitutional protections afforded to private property.

The measure states that its provisions are to be liberally construed to effectuate its purposes. The measure provides that any laws enacted in derogations [sic] of the measure are to be strictly construed.

*State impacts.* The proponents intend that existing estimates be used to satisfy requirements for municipal population data. If that approach is adopted, there will be no significant state fiscal impacts. If new projections are required, the Department of Lo-

cal Affairs estimates that it would require an additional six full-time employees at a cost of $347,846 to fulfill the requirements of the measure.

At this time, there does not appear to be any additional state fiscal impact.

*Local impacts.* Actual fiscal impacts on local governments are indeterminate. Local governments would assume direct costs in complying with the following five tasks required by the measure: 1) Delineating "committed areas"; 2) Developing "growth area maps"; 3) Referring growth area maps to a popular vote at a regular election; 4)Providing growth impact disclosures; and 5) Distributing the growth area map and associated impact disclosures to voters. The Department of Local Affairs estimates that the aggregate total direct costs of initial compliance with these five requirements on the part of local governments could possibly be as high as $60 million.

Only limited data exists regarding the cost to local governments of complying with an additional requirement under the measure: Ensuring that growth area maps are consistent with growth proposed by other local governments. These costs could be similar in magnitude to those associated with delineating committed areas and developing growth area maps.

Estimates of direct costs do not include the cost of updating zoning or other land use regulations in order to achieve consistency with committed areas and growth areas or the cost to be incurred by other political subdivisions (such as special districts or school districts) in complying with the measure as required by section 6 of the measure.

In the event of an unsuccessful election or in the event that growth area maps are revised in the future to reflect changing conditions, these direct costs will continue forward as recurring costs associated with local government planning efforts.

Indirect fiscal impacts on local governments are indeterminate. Possible indirect positive fiscal impacts to local governments would result from the control and possible reduction of some of the negative impacts of growth cited in section 1 ("Purpose") of the

measure. There could be a significant reduction in the cost of building new roads and extending water and sewer service to low density development. It is impossible to quantify the dollar value of these positive impacts.

Indirect negative impacts are similarly impossible to quantify and thus are also indeterminate. The measure could result in negative fiscal impacts from delays in, or prohibition of, certain developments, either in the short term as growth area maps are created and voted upon along with other planning tasks imposed by the measure or in the long term should citizens vote to curtail certain development.

*Hearing May 3, 2000:*

*At request of proponent, technical correction allowed in text of measure to delete material shown in strikeout type in Section 2(2)(c) and Section 4(4)(b).*

*Single subject and jurisdiction approved; staff draft amended; titles and summary set.*

*Hearing adjourned 5:32 p.m.*

*Hearing April 19, 2000:*

*Motion for Rehearing submitted by Jerry G. Percy denied with respect to jurisdictional grounds specified in paragraph 1, relating to changes made to text after the legislative staff review and comment hearing.*

*All Motions for Rehearing that raised single subject objections denied with respect to those objections.*

*Motions for Rehearing granted in part, to the extent that two changes were made to titles and that fiscal impact portion of summary was amended.*

*Motions for Rehearing denied in all other respects.*

*Hearing adjourned 5:03 p.m.*

Appendix B

ARTICLE XXVIII

CITIZEN MANAGEMENT OF GROWTH

BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO:

The constitution of the state of Colorado is hereby amended BY THE ADDITION OF A NEW ARTICLE to read:

Section 1. Purpose. THE PEOPLE OF COLORADO FIND THAT RAPID, UNPLANNED AND UNREGULATED GROWTH THROUGH DEVELOPMENT AND SUBDIVISION OF LAND IS A MATTER OF STATEWIDE SIGNIFICANCE AND CONCERN, BECAUSE IT IS CAUSING SERIOUS HARM TO PUBLIC HEALTH, SAFETY, AND WELFARE BY CONSUMING LARGE TRACTS OF OPEN SPACE AND FARM AND RANCH LANDS, SCENIC VISTAS AND ARCHAEOLOGICAL AND HISTORIC SITES; IMPOSING UNFAIR TAX BURDENS ON EXISTING RESIDENTS; OVERBURDENING POLICE PROTECTION, EMERGENCY SERVICES, SCHOOLS, ROADS, WATER SUPPLIES, AND OTHER PUBLIC FACILITIES AND SERVICES; CREATING INCREASED LEVELS OF TRAFFIC CONGESTION; CAUSING UNHEALTHY LEVELS OF AIR AND WATER POLLUTION; HARMING WILDLIFE, BIODIVERSITY AND ECOSYSTEMS; AND IMPAIRING THE ABILITY OF CITIES, CITY AND COUNTIES, COUNTIES, AND TOWNS TO MAINTAIN COMMUNITY CHARACTER AND PROTECT NEIGHBORHOODS. THE PURPOSE OF THIS ARTICLE IS TO REQUIRE CITIZEN MANAGEMENT OF GROWTH, BY PROVIDING VOTERS WITH INFORMATION CONCERNING GROWTH IMPACTS, BY PROVIDING VOTERS WITH CONTROL OVER GROWTH AREAS IN THEIR COMMUNITIES, AND BY REQUIRING COORDINATION AMONG LOCAL GOVERNMENTS WITH RESPECT TO PROPOSED GROWTH AREAS. THIS ARTICLE SHALL PRE EMPT ANY INCONSISTENT PROVISION OF THIS CONSTITUTION, STATE STATUTE, LOCAL ORDINANCE, OR OTHER PROVISION OF LAW.

Section 2. Definitions. AS USED IN THIS ARTICLE, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1) "CENTRAL WATER AND SEWER SERVICE" MEANS THE PROVISION OF POTABLE WATER AND DISPOSAL OF SEWAGE BY MEANS OF WATER SUPPLY PIPES LEADING FROM A WATER TREATMENT PLANT OR COMMUNITY WELL AND SANITARY SEWER PIPES LEADING TO AN EFFLUENT TREATMENT PLANT THAT IS NOT A FREE-STANDING PACKAGE PLANT.

(2) "COMMITTED AREA" MEANS AN AREA OF LAND WHICH HAS BEEN COMMITTED TO DEVELOPMENT, IN THAT THE LAND MEETS ONE OR MORE OF THE FOLLOWING CRITERIA:

(a) AS OF THE DATE ON WHICH THE LOCAL GOVERNMENT BECOMES SUBJECT TO THIS ARTICLE, ALL OF THE LAND CONTAINED WITHIN A RECORDED SUBDIVISION OR TOWNSITE AND AT LEAST 50% OF THE LOTS IN SUCH SUBDIVISION OR TOWNSITE (I) HAVE HAD PERMANENT, PRIMARY STRUCTURES CONSTRUCTED ON THEM OR (II) HAVE HAD CENTRAL WATER AND SEWER SERVICES EXTENDED TO THEM AND ALL LOTS ARE OR SHALL BE SERVED BY CENTRAL WATER AND SEWER WHEN THE DEVELOPMENT IS COMPLETE; OR

(b) A VALID DEVELOPMENT APPLICATION AS TO SUCH LAND, THE APPROVAL OF WHICH WOULD RESULT IN DEVELOPMENT THAT SHALL BE SERVED BY CENTRAL WATER AND SEWER SERVICES, HAS BEEN SUBMITTED TO THE APPROPRIATE LOCAL GOVERNMENT, AS OF THE DATE ON WHICH THE 2000 GENERAL ELECTION BALLOT WAS CERTIFIED BY THE COLORADO SECRETARY OF STATE; OR

(c) THE LAND HAS BEEN IDENTIFIED BY THE LOCAL GOVERNMENT AS AN AREA FOR DEVELOPMENT OR REDEVELOPMENT AND IT DIRECTLY ABUTS, EXCEPT FOR INTERVENING DEDICATED PUBLIC STREETS OR ROADS, AREAS MEETING THE CRITERIA OF PARAGRAPH (a) OF SUBSECTION (2) HEREOF ALONG 100% OF ITS PERIMETER, OR ALONG AT LEAST 50% OF ITS PERIMETER AND BY PERMANENTLY PROTECTED OPEN SPACES, FEDERAL LANDS, OR BODIES OF WATER ALONG THE REMAINDER OF ITS PERIMETER.

(3) "DEVELOPMENT" MEANS COMMERCIAL, RESIDENTIAL, OR INDUSTRIAL CONSTRUCTION OR OTHER ACTIVITY WHICH CHANGES THE BASIC CHARACTER OR THE USE OF THE LAND SO AS TO PERMIT COMMERCIAL, RESIDENTIAL OR INDUSTRIAL CONSTRUCTION. "DEVELOPMENT" SHALL NOT INCLUDE THE CONSTRUCTION, OPERATION, MAINTENANCE, REPAIR, OR REPLACEMENT, OF FACILITIES FOR TELECOMMUNICATIONS, PUBLIC UTILITIES, MINING OF MINERALS AND CONSTRUCTION MATERIALS, OIL AND GAS EXPLORATION AND PRODUCTION, OR FOR THE DIVERSION, STORAGE, TRANSPORTATION, OR USE OF WATER WITHIN THE STATE OF COLORADO.

(4) "GROWTH AREA" IS AN AREA SHOWN ON A GROWTH AREA MAP APPROVED BY THE VOTERS AS AN AREA WITHIN WHICH DEVELOPMENT MAY OCCUR.

(5) "LOCAL GOVERNMENT" MEANS ALL STATUTORY, CHARTER, AND HOME RULE CITIES AND TOWNS, HOME RULE AND STATUTORY COUNTIES, AND CITIES AND COUNTIES.

(6) "REGULAR ELECTION" MEANS AN ELECTION HELD ON THE FIRST TUESDAY AFTER THE FIRST MONDAY IN NOVEMBER IN EVEN–NUMBERED YEARS, OR AN ELECTION HELD ON THE FIRST TUESDAY IN NOVEMBER IN ODD–NUMBERED YEARS.

(7) "SUBDIVISION" MEANS THE DIVISION OF AN AREA OF LAND OR A DEFINED LOT OR TRACT INTO TWO OR MORE DEFINED LOTS OR TRACTS.

(8) "VALID DEVELOPMENT APPLICATION" MEANS AN APPLICATION THAT SUBSTANTIVELY MEETS ALL OF THE RULES FOR SUBMISSION AP-

PLICABLE TO A PROPOSAL AND THAT HAS BEEN ACCEPTED AS TIMELY AND COMPLETE BY THE LOCAL GOVERNMENT REGULATING THE USE OF LAND COVERED BY THE APPLICATION.

Section 3. Permitted Development. LOCAL GOVERNMENTS, UNLESS EXEMPTED IN ACCORDANCE WITH SUBSECTION (1) OR (2) OF SECTION 4 OF THIS ARTICLE, SHALL ONLY APPROVE DEVELOPMENT (a) WITHIN COMMITTED AREAS, (b) WITHIN GROWTH AREAS IN ACCORDANCE WITH VOTER–APPROVED GROWTH AREA MAPS, OR (c) IN ACCORDANCE WITH THE EXCEPTIONS CONTAINED IN SECTION 9 OF THIS ARTICLE.

Section 4. Growth Area Maps.

(1) THIS ARTICLE SHALL APPLY TO ALL COUNTIES AND CITY AND COUNTIES WITH A POPULATION GREATER THAN 10,000 RESIDENTS AS SHOWN BY THE MOST RECENT DECENNIAL CENSUS, OR IF MORE THAN FIVE YEARS HAVE PASSED SINCE THE LAST CENSUS DATE, THEN THE POPULATION SHOWN BY A PROJECTION PREPARED BY THE DEPARTMENT OF LOCAL AFFAIRS OR ITS SUCCESSOR AS OF THE BEGINNING OF THE FIFTH YEAR FOLLOWING THAT CENSUS DATE. THE GOVERNING BODY OF ANY COUNTY WITH A POPULATION OF LESS THAN 25,000 RESIDENTS MAY SUBMIT A REFERRED QUESTION TO THE VOTERS EXEMPTING FOR A MAXIMUM PERIOD OF FOUR YEARS THE ENTIRE COUNTY AND ALL LOCAL GOVERNMENTS WITHIN IT FROM ALL REQUIREMENTS OF THIS ARTICLE. UPON VOTER APPROVAL OF SUCH AN EXEMPTION, THIS ARTICLE SHALL NOT APPLY TO SAID COUNTY AND ALL LOCAL GOVERNMENTS WITHIN IT FOR THE PERIOD APPROVED BY THE VOTERS. SAID FOUR–YEAR PERIOD MAY BE RENEWED OR EXTENDED BY A SUBSEQUENT REFERRED QUESTION.

(2) THIS ARTICLE SHALL ALSO APPLY TO EVERY CITY OR TOWN WITH ANY PORTION OF ITS CORPORATE LIMITS LOCATED IN ANY COUNTY TO WHICH THIS ARTICLE APPLIES. CITIES OR TOWNS WITH FEWER THAN 1,000 RESIDENTS SHALL NOT BE REQUIRED TO PREPARE A GROWTH AREA MAP, PROVIDED, HOWEVER, THAT THE GOVERNING BODY OF A CITY OR TOWN OF FEWER THAN 1,000 RESIDENTS SHALL NOT APPROVE ANY DEVELOPMENT THAT WOULD CAUSE THE CITY'S OR TOWN'S POPULATION TO EXCEED 1,000 UNTIL THE VOTERS OF THAT CITY OR TOWN HAVE APPROVED A GROWTH AREA MAP WITH RESPECT THERETO AS REQUIRED BY THIS ARTICLE.

(3) EVERY LOCAL GOVERNMENT SUBJECT TO THIS ARTICLE SHALL DELINEATE ITS COMMITTED AREAS NOT LATER THAN DECEMBER 31, 2001 OR WITHIN ONE YEAR OF BECOMING SUBJECT TO THIS ARTICLE, WHICHEVER OCCURS LATER.

(4) A GROWTH AREA MAP SHALL INCLUDE A MAP AND TEXT DESCRIBING A PROPOSED GROWTH AREA AND SHALL IDENTIFY THE GENERAL LOCATIONS OF EACH PROPOSED LAND USE AND THE GENERAL RANGE OF DEVELOPMENT DENSITIES WITHIN SUCH GROWTH AREA. NO PROPOSED GROWTH AREA MAY BE DESIGNATED ON A GROWTH AREA MAP UNLESS THE DEVELOPMENT IN SUCH AREA SHALL BE SERVED BY A CENTRAL WATER AND SEWER SYSTEM AND ROADS, WHICH CAN BE CONSTRUCTED CONSISTENT WITH APPLICABLE BORROWING, TAXING, AND SPENDING LIMITATIONS, WITHIN TEN YEARS FOLLOWING VOTER APPROVAL. FOR EVERY CITY, CITY AND COUNTY, OR TOWN, EACH PROPOSED GROWTH AREA SHALL ABUT ALONG ONE SIXTH OR MORE OF ITS PERIMETER TO A COMMITTED AREA OR TO ONE OR MORE GROWTH AREAS THAT WERE PREVIOUSLY APPROVED BY THE VOTERS OF THE PROPOSING

CITY, CITY AND COUNTY, OR TOWN. EACH GROWTH AREA MAP AND ITS TEXT:

(a) SHALL BE CONSISTENT WITH THE GROWTH IMPACT DISCLOSURES SET FORTH IN SECTION 5 OF THIS ARTICLE;

(b) SHALL BE DEVELOPED WITH CITIZEN PARTICIPATION, INCLUDING, PRIOR TO BEING REFERRED FOR VOTER APPROVAL, AT LEAST ONE PUBLIC HEARING BEFORE THE PLANNING COMMISSION OR EQUIVALENT BODY, AND AT LEAST ONE PUBLIC HEARING BEFORE THE GOVERNING BODY OF THE PROPOSING LOCAL GOVERNMENT UPON THIRTY DAYS' PUBLISHED NOTICE; AND

(c) SHALL BE CONSISTENT WITH GROWTH PROPOSED BY OTHER LOCAL GOVERNMENTS, IN THAT GROWTH AREA MAPS (I) SHALL BE DEVELOPED IN COOPERATION WITH THE GOVERNMENT OF EACH COUNTY IN WHICH THE PROPOSED GROWTH AREA IS LOCATED AND ANY OTHER LOCAL GOVERNMENT THAT SHARES A COMMON BOUNDARY WITH THE PROPOSED GROWTH AREA; AND (II) SHALL NOT CONFLICT WITH OR OVERLAP THE GROWTH AREA MAP THAT ANOTHER LOCAL GOVERNMENT IS PROPOSING FOR APPROVAL AT THE SAME ELECTION OR WHICH HAS BEEN PREVIOUSLY APPROVED BY THE VOTERS OF ANOTHER LOCAL GOVERNMENT.

Section 5. Voter Approval and Growth Impact Disclosures. THE GOVERNING BODY OF EACH LOCAL GOVERNMENT PROPOSING A GROWTH AREA SHALL REFER EACH PROPOSED GROWTH AREA MAP TO A POPULAR VOTE AT A REGULAR ELECTION.

(1) THE BALLOT TITLE AND SUBMISSION CLAUSE FOR THE REFERENDUM SHALL BRIEFLY SUMMARIZE THE PROPOSED GROWTH AREA WITHOUT ARGUMENT OR PREJUDICE, AND SHALL ASK WHETHER THE PROPOSED GROWTH AREA MAP SHALL BE ADOPTED.

(2) THE PROPOSING LOCAL GOVERNMENT SHALL PROVIDE GROWTH IMPACT DISCLOSURES THAT DESCRIBE THE IMPACTS OF DEVELOPMENT ALLOWED BY THE PROPOSED GROWTH AREA MAP. THE GROWTH AREA MAP AND THE ASSOCIATED GROWTH IMPACT DISCLOSURES SHALL BE DISTRIBUTED TO VOTERS IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN ARTICLE X, SECTION 20(3). THE GROWTH IMPACT DISCLOSURES SHALL DESCRIBE:

(a) THE ELEMENTS OF THE PROPOSED GROWTH AREA, INCLUDING, IF APPLICABLE, OPEN SPACES AND PARKS; NEW PUBLIC FACILITIES AND INFRASTRUCTURE, INCLUDING LAW ENFORCEMENT, EMERGENCY AND HEALTH SERVICES, RECREATIONAL FACILITIES, ROADS, ALTERNATIVE TRANSPORTATION, SCHOOLS, FIRE PROTECTION FACILITIES, WATER AND SEWER SERVICES, THE INITIAL AND ONGOING COSTS FOR SUCH FACILITIES AND INFRASTRUCTURE, AND THE PROPOSED FUNDING SOURCES FOR THESE COSTS; NUMBER OF HOUSING UNITS, INCLUDING AFFORDABLE HOUSING UNITS; AND ANY LOCAL GOVERNMENT REVENUE SHARING ARRANGEMENTS; AND

(b) THE ANTICIPATED EFFECTS OF THE PROPOSED GROWTH, INCLUDING PROJECTED POPULATION INCREASE; TRANSPORTATION AND TRAFFIC IMPACTS WITHIN AND OUTSIDE THE GROWTH AREA; PROJECTED EFFECT UPON REGIONAL AIR QUALITY; WATER SUPPLY NEEDED AND THE ANTICIPATED SOURCES AND COST OF THE WATER SUPPLY; AND HOW THE PROPOSED GROWTH AREA MAP CONFLICTS OR COORDINATES WITH GROWTH AREA MAPS EITHER APPROVED BY, OR BEING PROPOSED TO, THE VOTERS OF ADJACENT LOCAL GOVERNMENTS.

(3) ALL GROWTH IMPACT DISCLOSURES SHALL BE BASED UPON THE

BEST GENERALLY AVAILABLE DATA ROUTINELY USED BY LOCAL GOVERNMENT PLANNERS IN THIS STATE IN THE PREPARATION OF MASTER PLANS AND COMPREHENSIVE PLANS.

Section 6. Allowed Actions within Growth Area. ALL DEVELOPMENT, SUBDIVISION OF LAND, CHANGES IN LAND USE OR DENSITY, AND CONSTRUCTION OR EXTENSION OF CENTRAL WATER OR SEWER SYSTEMS OR ROADS ON LAND THAT IS WITHIN A VOTER APPROVED GROWTH AREA SHALL BE IN ACCORDANCE WITH THE GROWTH AREA MAP. DEVELOPMENT UNDERTAKEN BY OTHER POLITICAL SUBDIVISIONS OF THE STATE, ENTERPRISES, SPECIAL IMPROVEMENT DISTRICTS, SPECIAL DISTRICTS, TAX INCREMENT FINANCING DISTRICTS, OR SCHOOL DISTRICTS, SHALL ALSO BE IN ACCORDANCE WITH THE GROWTH AREA MAP.

Section 7. Development within Committed Areas. DEVELOPMENT OR SUBDIVISION OF LAND WITHIN A COMMITTED AREA MAY BE COMPLETED WITHOUT VOTER APPROVAL IF THE DEVELOPMENT IS COMPLETED IN ACCORDANCE WITH APPROVED PLANS, AND ANY APPLICABLE REGULATIONS AND GUIDELINES.

Section 8. Amendment to Growth Area Maps. ANY LOCAL GOVERNMENT MAY REFER AN ISSUE TO THE VOTERS TO AMEND AN APPROVED GROWTH AREA MAP AT A REGULAR ELECTION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS ARTICLE.

Section 9. Land Outside Committed Areas and Growth Areas. NO DEVELOPMENT OR SUBDIVISION OF LAND SHALL BE APPROVED FOR LAND NOT INCLUDED IN A COMMITTED AREA OR AN APPROVED GROWTH AREA, EXCEPT THAT A LOCAL GOVERNMENT MAY APPROVE OR ALLOW, IN ACCORDANCE WITH ITS LAND USE RULES AND REGULATIONS:

(1) DEVELOPMENT WHICH (a) DOES NOT REQUIRE ANY FURTHER LOCAL GOVERNMENT APPROVALS OR (b) REQUIRES ONLY THE ISSUANCE OF A BUILDING PERMIT;

(2) DEVELOPMENT OR SUBDIVISION OF LAND CONSISTENT WITH A VALID DEVELOPMENT APPLICATION WHICH HAD BEEN FILED AS OF THE DATE ON WHICH THE 2000 GENERAL ELECTION BALLOT WAS CERTIFIED BY THE COLORADO SECRETARY OF STATE;

(3) THE CREATION OF NO MORE THAN THREE LOTS OF NO MORE THAN TWO ACRES EACH TO ACCOMMODATE RESIDENCES OF IMMEDIATE FAMILY MEMBERS OF AN AGRICULTURAL PROPERTY OWNER;

(4) A DIVISION OF LAND THAT IS NOT SUBJECT TO ITS CONTROL AS A SUBDIVISION OF LAND BASED ON STATUTES IN EFFECT AT THE TIME THE LAND IS SUBDIVIDED;

(5) PUBLICLY OWNED FACILITIES NECESSARY FOR THE PUBLIC HEALTH, SAFETY, OR WELFARE;

(6) A DIVISION OF LAND THAT IS PERMITTED BY STATUTE AS A RURAL CLUSTER DEVELOPMENT AS OF THE EFFECTIVE DATE OF THIS ARTICLE;

(7) NON-RESIDENTIAL DEVELOPMENT OF LESS THAN TEN THOUSAND SQUARE FEET TO PERMIT RETAIL OR SERVICE USE WHERE NO OTHER RETAIL OR SERVICE USES ARE LOCATED WITHIN ONE MILE OF THE SITE; AND

(8) COMMERCIAL OR INDUSTRIAL DEVELOPMENT, OTHER THAN CONFINED ANIMAL FEEDING OPERATIONS OR RELATED FACILITIES, THAT PROVIDES ONLY GOODS OR SERVICES TO SUPPORT NEARBY AGRICULTURAL OPERATIONS, IN AN AREA WHERE THERE ARE NO OTHER COMMERCIAL OR INDUSTRIAL SITES WITHIN ONE MILE.

Section 10. Private Property Rights. NOTHING IN THIS SECTION [sic] IS IN-

TENDED TO AFFECT OTHER CONSTITUTIONAL PROTECTIONS AFFORDED TO PRIVATE PROPERTY.

Section 11. Interpretation. THIS ARTICLE SHALL BE LIBERALLY CONSTRUED TO EFFECTUATE THE PURPOSES SET OUT IN SECTION 1. ANY LAWS ENACTED IN DEROGATION OF THIS ARTICLE SHALL BE STRICTLY CONSTRUED.

